**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| DR. JOHN LOZOWSKI,<br><br>Plaintiff,<br><br>v.<br><br>CAPE REGIONAL PHYSICIANS ASSOCIATES,<br><br>Defendant. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br>No. 22-1578 (KMW-EAP)<br><br>**OPINION** |

APPEARANCES:

ANDREW M. SMITH, ESQ.
SMITH MARCINO & BOWMAN
208 N. EASTON ROAD
WILLOW GROVE, PA 19090

   *Counsel for Plaintiff Dr. John Lozowski*

BRIAN JOSEPH MCGINNIS, ESQ.
FOX ROTHSCHILD LLP
2000 MARKET STREET, 20TH FLOOR
PHILADELPHIA, PA 19103

   *Counsel for Defendant Cape Regional Physicians Associates*

**WILLIAMS, District Judge:**

## I.      INTRODUCTION

Plaintiff Dr. John Lozowski ("Plaintiff") brings this action against Defendant Cape Regional Physicians Associates ("Defendant"), alleging that Defendant breached their employment agreement when terminating Plaintiff's employment in June of 2021.

This matter comes before the Court on Defendant's Motion for Summary Judgment, (ECF No. 34). Plaintiff opposed the motion, (ECF No. 37), and Defendant replied, (ECF No. 39). For the reasons that follow, the Court will grant Defendant's Motion for Summary Judgment, (ECF No. 34).[1]

## II.     BACKGROUND

The Parties entered into an employment agreement ("the Agreement") effective May 2019, whereby Plaintiff was employed by Defendant "to practice medicine and render professional medical services." *See* Defendant's Statement of Material Facts ("SMF") ¶¶ 4, 9-13, 26-27; *see also* Def. Motion for Summary Judgment at Ex. B at Article 2.1. Plaintiff began seeing patients at Defendant's Seaville, NJ location in May of 2019. SMF ¶¶ 4, 13. The Agreement provided that Defendant would guarantee Plaintiff's annual base compensation for the first two years of his contract at $220,500.00 based on services provided on a thirty-six clinical hours per week basis, generating 5,000 work RVUs[2] in a twelve-month period and that a $20,000.00 retention bonus would be available if Plaintiff generated 5,000 RVUs in year two of his three-year Agreement. *Id.* ¶¶ 52, 55-56.

---

[1] Pursuant to Local Civil Rule 78.1(b), this motion will be decided on the papers without oral argument.

[2] "RVU" stands for "Relative Value Units" which represents a standardized, objective way to determine physician reimbursements for services provided, as a way of measuring physician productivity. *Id.* ¶ 53.

On May 19, 2021, the Chief Financial Officer ("CFO") emailed Plaintiff a letter notifying him that his productivity for his second year fell below the 5,000 RVUs required to receive his retention bonus. *Id.* ¶¶ 8, 72-75. The letter also noted that, pursuant to the Agreement, Defendant had the right to reduce Plaintiff's base compensation if he failed to maintain the agreed upon productivity levels, but at that time Defendant was not electing to utilize this provision and wanted to bring this provision to Plaintiff's attention "in an effort to avoid this course of action" in the future. *Id.* ¶¶ 77.

On May 24, 2021, Plaintiff responded to the May 19 email, informing Defendant that his office manager was refusing to increase his patient volume despite his requests for an increase and that various factors out of Plaintiff's control were impeding his ability to achieve the required 5,000 RVUs. *Id.* ¶¶ 78-79. Plaintiff ended his email with the following: "[i]f I receive no retention bonus my time with [Defendant] will be short lived and the day [Defendant] decides to decrease my compensation will be literally my last day." *Id.* ¶ 79.

On the morning of June 2, 2021, the CFO called Plaintiff to discuss his response to the May 19 email and explained that even when Plaintiff's hours were adjusted to account for his leave of absence, Plaintiff still fell short of the 5,000 RVUs for his retention bonus, and that Defendant would not deviate from the terms of the Agreement. *Id.* ¶¶ 84-85. Plaintiff responded "So I'll be terminating my relationship maybe immediately. I need to – I'll speak to my attorney and I'll get back to you about that." *Id.* ¶ 85. At 2:47 p.m. the same day, Plaintiff emailed Byron, the Vice President of Human Resources, with the subject line "Termination," stating: "[p]lease accept email as immediately termination of my employment with [Defendant]. Despite [Defendant] limiting my ability to see patients thru the Coronavirus Pandemic my retention bonus will not be paid according to an as usual angry aggressive unprofessional [CFO]. [. . .] It has been a pleasure

3

working with you Byron, Good Luck." *Id.* ¶¶ 88, 90, 92; *see also* Def. Motion for Summary Judgment at Ex. F. Later that same day, at 7:52 p.m., Plaintiff sent Byron a second email titled "Termination" stating in pertinent part: "Please disregard my termination email. [. . .] I will abide by our agreement and stay the three years." *Id.* ¶¶ 96-97; *see also* Def. Motion for Summary Judgment at Ex. G.

In response to the email exchange, Plaintiff scheduled an appointment with a psychiatrist. *Id.* ¶ 101. On June 7, 2021, the psychiatrist provided Plaintiff with a note indicating that Plaintiff could not work through June 30, 2021, due to major depressive disorder. *Id.* ¶102. Plaintiff faxed the note to the Defendant the same day. *Id.* In addition, at some point on June 7, 2021, the Chief Medical Officer ("CMO") and Plaintiff spoke by telephone. *Id.* ¶ 105.

On June 8, 2021 at 11:34 a.m., Plaintiff emailed the CMO, noting that he had some "issues" he wanted to address related to his departure from the practice, specifically (1) when his incentive bonus for 2020-2021 would be paid, (2) requesting that his "exit date" coincide with "my out of work note," and (3) seeking clarity on the non-compete clause of the Agreement to ascertain whether he could continue to practice in Atlantic County if he solely took house calls or worked part time in an urgent care setting. *Id.* ¶¶ 104-106; *see also* Def. Motion for Summary Judgement at Ex. J. Later that same day, at 8:31 p.m., the CMO responded to Plaintiff and explained that she needed to hear back from others to answer the question about whether Defendant could "adjust the date of [Plaintiff's] resignation" and what activities would be compliant with the noncompete clause of the Agreement. *Id.* ¶¶109-110; *see also* Def. Motion for Summary Judgment at Ex. J.

On June 9, 2021, at 8:20 am, Plaintiff replied to the CMO, stating in pertinent part, "[a]s far as the exit date, since we are mutually agreeing to separate the exit date can be set at whatever

we agree. It would not effect [the Agreement] at all but would benefit help me receive disability benefits." *Id.* ¶¶ 111-112; *see also* Def. Motion for Summary Judgment at Ex. J.

On June 18, 2021, the CMO responded to Plaintiff via email with the subject line "RE: Resignation," on which the Vice President of Human Resources was cc'd, that stated: "Sorry for the delay in this response. Attached is the letter confirming mutual termination under Article 3.2 of your employment agreement. The incentive will be processed. The resignation date was already on record in your email. We really are not able to adjust that date [and . . .] there will be a separate communication to address your request to practice urgent care in Atlantic [C]ounty. We will be in touch again next week." *Id.* ¶ 114; *see also* Def. Motion for Summary Judgment at Ex. J. The letter attached to the email is dated June 15, 2021, ("June 15 letter"), with the subject line "Re: Article 3.2 Termination by Mutual Agreement," states in pertinent part:

> This letter will serve to memorialize our conversation on June 7, 2021. On June 2, 2021 you tendered your resignation based on a telephone conversation you had with Mark Gill, CFO, Cape Regional Health System, where you alleged Mark was angry, aggressive, yelling, unprofessional and had created a hostile work environment. Byron Hunter, Vice President of Human Resources, contacted you and advised of our hostile workplace policy and that he would be conducting an investigation[.]
>
> On June 3, 2021, I spoke with you concerning your request to rescind your resignation. I advised you that I could not grant your request at that time and would await the results of Byron's investigation. On Monday, June 7th I advised you that the investigation, which included listening to the audio of the telephone conversation, found that your depiction of the events did not occur as stated. I advised you that I was accepting your resignation of June 2nd and given that your resignation was occurring during the term of you[r] employment agreement, we could avoid breach by invoking Article 3.2 of the employment agreement. I further advised that we would forgo Article 3.9 (Liquidated Damages) of the employment agreement. [. . .]

*Id.* ¶¶ 115, 117; *see also* Def. Motion for Summary Judgment at Ex. L.

Here, the Parties agree that the Agreement is a valid contract, and that the circumstances leading to Plaintiff's initial resignation did not give rise to Plaintiff's ability to invoke Article 3.5 of the Agreement to unilaterally resign. Thus, the only dispute relates to whether Article 3.2 of the Agreement, which provides: "[t]his agreement shall terminate at any time upon the mutual written agreement of the parties. Such termination shall be effective as of the date set forth in the written agreement," governs Plaintiff's termination. *Id.* ¶ 37; *see also* Def. Motion for Summary Judgment at Ex. B.

## III.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with 'specific facts showing that there is a genuine issue for trial.''" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence

that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256-57. "A nonmoving

party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap*

*Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992)

(quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion

for summary judgment, the court views the facts and all reasonable inferences drawn from the

facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at

587.

## IV.   DISCUSSION

The Court notes that in Plaintiff's opposition brief, Plaintiff stipulates to the dismissal of

Counts II and IV relating to his claims of detrimental reliance and violations of the Americans

with Disabilities Act and the New Jersey Law Against Discrimination. *See* Opp. at 3.[3] Thus, all

that remains for the Court to consider is Plaintiff's breach of contract claim and breach of the

covenant of good faith and fair dealing claim.[4] These claims will be addressed in turn below.

### A. Breach of Contract

To establish a breach of contract claim under New Jersey law, a party must show that there

was a contract between the parties, there was a breach of that contract, damages resulted from the

breach, and the party stating the claim performed its own contractual obligations. *Doe v. Bank of*

*Am., N.A.*, No. 16-3075, 2018 WL 295565 at *5 (D.N.J. Jan. 3, 2018). Here, the Parties do not

---

[3] The Court notes that Plaintiff does not explicitly state that he was stipulating to dismiss his NJLAD claims which were also asserted in the fourth count of his Complaint. *Id.* However, Plaintiff never addresses Defendant's arguments relating to the NJLAD, and thus the Court considers that claim to be abandoned and grants summary judgment related to Plaintiff's NJLAD claims. *See Brown v. Johnson*, 116 Fed. App'x 342, 345-46 (3d Cir. 2004) ("[A]n issue raised in the complaint but ignored at summary judgment may be deemed waived [. . .] it is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.") (internal citations and quotations omitted).

[4] There is no dispute that the case arises under New Jersey law, thus the Court will apply New Jersey law herein. *See Marino v. Brighton Gardens of Mountainside*, No. 20-7142, 2023 U.S. Dist. LEXIS 175668 at *4-5 (D.N.J. Sept. 29, 2023).

contest that there was a valid contract between them, rather the dispute hinges on whether Plaintiff's termination was in fact a mutual agreement or if Defendant breached by "forcing" Plaintiff to accept termination, using the language of the June 15th letter to hide their breach. Opp. at 10. Defendant argues that the June 15 letter represents a mutual agreement for termination as contemplated in Article 3.2. *See* Def.'s Motion for Summary Judgment at 22.

First, the Court must determine whether Article 3.2 is clear or ambiguous. *See Heffron v. Adamar of N.J. Inc.*, 270 F. Supp. 2d 562, 570 (D.N.J. 2003). Ultimately, if Article 3.2 is susceptible to more than one meaning, it becomes an issue for the factfinder to resolve. *Pacitti*, 193 F.3d at 773. However, where contractual language is unambiguous, a court's role is to interpret the contract as a matter of law. *Id.*[5] Here, the Court finds no ambiguity. The express terms of Article 3.2 of the Agreement require a written mutual agreement to support a "mutual termination." Simply stated, the June 15 letter is itself written confirmation of the Parties' mutual agreement.

However, "[e]ven where a contractual provision appears to be clear on its face, it is appropriate for a court to consider the contract language, the meanings suggested by counsel, and

---

[5] A court must "assume[] the intent of the parties to an instrument is embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Heffron*, 270 F. Supp. 2d at 570 (internal citations and quotations omitted). On its face, the language of Article 3.2 is not ambiguous. Article 3.2 provides: "3.2 Termination by Mutual Agreement. This Agreement shall terminate at any time upon the mutual written agreement of the parties. Such termination shall be effective as of the date set forth in the written agreement." *See* Def. Motion for Summary Judgment at Ex. B. However, "the Court must construe these words in light of the agreement as a whole[.]" *Armkel, LLC v. Pfizer, Inc.*, No. 2-4206, 2005 WL 2416982 at *10 (D.N.J. Sept. 29, 2005) (citing *Senior Exec. Benefit Plan Participants v. New Valley Corp.*, 89 F.3d 143, 149 (3d Cir. 1996)) ("A court cannot interpret words in a vacuum, but rather must carefully consider the parties' context and the other provisions in the plan."). The Court notes that none of the articles relating to termination in Article 3 require a writing to include signatures. *See* Def. Motion for Summary Judgment at Ex. B. Notably, Article 12.5 governing "amendments" is the only part of the agreement that requires a writing be signed by both of the parties. *Id.* It is clear, to this Court that if the Parties wished to include additional requirements for termination, such as requiring the Parties' signatures, such language would have been included in Article 3.2 as it was in Article 12.5. The Court cannot rewrite the terms of a contract "by substituting a new or different provision from what is clearly expressed in the contract itself," as Plaintiff requests, even if "it [would] have been functionally desirable to draft [the contract] differently." *INDECS Corp. v. Claim Doc, LLC*, No. 16-4421, 2020 WL 5868796 at *9 (D.N.J. Oct. 2, 2020); *Atlantic City Racing Assoc.*, 90 F. Supp. 2d at 506. The Court is obligated to enforce those terms as written where the terms of the contract are clear, as here. *Atlantic City Racing Assoc.*, 90 F. Supp 2.d at 506.

the extrinsic evidence offered in support of each interpretation." *D&D Associates v. Board of Education*, No. 3-1026, 2012 U.S. Dist. LEXIS 44887 at \*74-75 (D.N.J. Mar. 30, 2012) (internal citation and quotation omitted). To satisfy this inquiry, the Court is permitted to review, but is not limited to, the structure of the contract, the writings that are part of the same transaction, the bargaining history between the parties, the conduct of the parties as it reflects their understanding of the contract's meaning. *Id.* at \*75 (quoting *Pacitti*, 193 F.3d at 773); *see also id.* at \*76 (quoting Restatement (Second) of Contracts § 202(2), (5)) ("Writings that are part of the same transaction are to be interpreted together, and a contract's meaning, '[w]herever reasonable,' is to be 'interpreted as consistent with . . . any relevant course of performance, course of dealing, or usage of trade.'"). Thus, the Court considers the various emails and phone calls that Plaintiff had with Defendant prior to the June 15 letter to ascertain the Parties' understanding of Article 3.2.

Here, the intent of the Parties is clear from the interactions, both via telephone, email, and in the final writing, that both sides agreed that Plaintiff would leave Defendant's practice. It is undisputed that Plaintiff initiated the termination discussions, both orally and in writing. *See* SMF ¶¶ 79, 85, 87-88. As all Parties have noted and agreed, Plaintiff's ability to unilaterally terminate was delineated by the Agreement in Article 3.5, and his June 2 email did not comport with the requirements provided in Article 3.5. Thus, Plaintiff's attempt to unilaterally terminate was a breach of the Agreement, whether or not it was "accepted" as an "offer." Therefore, as Plaintiff's resignation would have constituted a unilateral termination, and because it did not comport with the requirements of Article 3.5, Plaintiff would have been subject to liquidated damages in the amount of $28,000. *See* SMF ¶¶ 42, 48; *see also* Def. Motion for Summary Judgment at Ex. B. Instead, notwithstanding Plaintiff's unilateral decision to terminate his employment with

9

Defendant, Defendant offered Plaintiff the opportunity to convert his termination into a mutual termination pursuant to Article 3.2.

Moreover, while Plaintiff argues that the termination was not "mutual" because Defendant did not alter the non-compete language in the Agreement, nor did Defendant change Plaintiff's termination date to "make it easier for [his] disability filing," (SMF ¶ 106), these post-termination requests by Plaintiff do not inform the terms of Article 3.2 mutual termination provision. Indeed, the June 15 letter memorializes the agreement between Plaintiff and Defendant and on its face demonstrates the requisite elements of a mutual agreement: offer, acceptance, consideration, and meeting of the minds on all essential terms of the agreement. Crucially, the June 15 letter notes:

- that Plaintiff's resignation on June 2 was a breach of the contract. *See* SMF ¶¶ 104-117; *see also* Def. Motion for Summary Judgment at Ex. L.

- that during the Parties' June 7 phone call, to avoid the consequences of Plaintiff's unilateral breach of the Agreement, Defendant offered that the Parties could invoke Article 3.2 to mutually agree to terminate. *Id.*

- On June 8, Plaintiff had questions for Defendant regarding when his incentive bonus would be paid, that he would like to have the exit date extended to June 30 for his disability filing, and whether he could do home healthcare or urgent care in Atlantic County. *Id.* Later that same day, CMO answered Plaintiff's email addressing his proposed "issues" and noted that Plaintiff's requests would not be accommodated. *Id.*

- On June 9, Plaintiff affirmatively stated in his email that the Parties were "mutually agreeing to separate" fully illustrating his intention and his acceptance of the offer

to invoke Article 3.2. *Id.* The essential terms to this agreement were straightforward: both Parties wanted to separate. *Id.*

Importantly, in Plaintiff's June 9 email confirming the mutual agreement to terminate, Plaintiff did not give any indication that the additional post-termination "issues" he was inquiring about were material to his agreement to terminate his employment with Defendant. *Id.* at Def. Motion for Summary Judgment at Ex. L. Rather, record suggests that his requests were to ease his post-separation transition from Defendant's practice, none of which Defendant was obligated to accept. *Id.* Moreover, there was substantial consideration for this agreement: Plaintiff's breach was explicitly prohibited by the Agreement and would impose upon Plaintiff liquidated damages of $28,000.00 for the breach. *Id.* at Ex. B.[6]

Thus, as Plaintiff asserted in briefing: "Dr. Lozowski wanted to quit, Cape wanted to fire this disruptive employee and so they reach[ed] an agreement to separate, [and] place[d] it in writing[.]" Opp. at 9. Article 3.2 of the Agreement did not require signatures to effectuate the mutual agreement to terminate and thus the June 15 letter fully embodied the mutual agreement of the Parties to terminate their contractual relationship. There is nothing in the record to suggest that the termination was forced or otherwise coercively obtained, aside from Plaintiff's own after-the-fact testimony. However, Plaintiff's self-serving deposition testimony is insufficient to demonstrate a dispute of material facts. Indeed, it is beyond cavil that at summary judgment, a plaintiff cannot rely on unsupported allegations and must provide some evidence that would show

---

[6] "3.9 Liquidated Damages for Breach [. . .] Therefore, the parties acknowledge and agree that [Defendant] will be materially harmed by Physician's breach of this Agreement. Accordingly, the parties acknowledge and agree that, if this Agreement terminates after the Effective Date and prior to the end of the Term other than pursuant to Sections 3.2 (mutual decision), 3.4(e) (death), 3.4(f) (disability), 3.5 ([Defendant] breach) or 3.7 (illegality), then [Defendant] shall be materially damaged and the amount of such damages shall be Twenty Eight Thousand ($28,000) Dollars[.]" *Id.* at Ex. B.

11

there exists a genuine issue of fact for trial. *Trivedi v. Slawecki*, 642 Fed. App'x 163, 168 (3d Cir. 2016).

Therefore, the mutual termination embodied in the June 15 letter does not constitute a breach of contract and summary judgment on this claim must be granted.

### B. Implied Covenant of Good Faith and Fair Dealing

In New Jersey, every contract "contains" an implied covenant of good faith and fair dealing. *Lexon Ins. Co. v. Borough of Union Beach*, No. 19-14655, 2023 WL 3727791 at *7 (D.N.J. May 30, 2023). Good faith conduct is understood to be "conduct that does not violate community standards of decency, fairness or reasonableness." *Cargill Global Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 580 (D.N.J. 2010) (internal citations and quotations omitted). The covenant ensures "neither party shall do anything which will have the effect of destroying or injuring the right of the other to receive the fruits of the contract." *Id.* (quoting *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, ,420 (1997)). To show that a party has breached the covenant of good faith and fair dealing, the other party must prove that the breach occurred under "a bad motive or intention;" allegations of which "should not be permitted to be advanced in the abstract and absent improper motive." *Citadel Wellwood Urb. Renewal, LLC v. Borough of Merchantville*, No. 21-16700, 2023 WL 8184314 at *11 (D.N.J. Nov. 22, 2023). In other words, proof of bad motive is a threshold issue. *Schweikert v. Baxter Healthcare Corp.*, No. 12-5876, 2015 WL 4578443 at *12 (D.N.J. Jul. 29, 2015). "[A] state of mind or malice-like element" is required to demonstrate bad motive or bad faith. *Id.* Importantly, the covenant cannot be invoked where the breach of the covenant stems from a breach of the contract itself. *Lilac Dev. Group, LLC v. Hess Corp.*, No. 15-7547, 2022 WL 310203 at *9 (D.N.J. Feb. 2, 2022) ("a breach of [the covenant] must differ from a literal violation of the contract.").

Here, it is clear from the record that Plaintiff's breach of contract and breach of the covenant claims are one and the same. Plaintiff is contesting whether his termination is unlawful pursuant to Article 3.2 of his contract. *See* Opp. at 2. Plaintiff is arguing that Defendants violated the contract itself, and therefore cannot invoke the covenant of good faith and fair dealing to address the same conduct that Plaintiff disputes as a breach of contract. *See Lilac Dev. Group, LLC*, 2022 WL 310203 at *9.

Plaintiff asserts that he was "forced" to accept unilateral termination by Defendant. Opp. at 10. However, as discussed at length above, the record clearly demonstrates that Plaintiff initiated his separation from Defendant. *See* SMF ¶¶ 79, 85, 88, 106, 108, 112. Nothing in the record suggests that Defendant acted in bad faith when the Parties ultimately agreed to terminate Plaintiff's employment or that Defendant had the requisite state of mind to support a breach of the covenant claim. Although Plaintiff points to the fact that he rescinded his initial resignation, Plaintiff had several conversations with management between the email he sent rescinding his termination request on June 2 and the final letter that confirmed Plaintiff's termination that was emailed to him on June 18. *See* SMF ¶¶ 79, 85, 88, 96-97, 103, 105-06, 112, 114. The record reflects that Plaintiff decided to leave Defendant's practice, that his requests regarding his termination date and the application of the non-compete provision were post termination issues that were considered. *Id.* While Defendant did not modify Plaintiff's termination date or his non-compete provision as Plaintiff requested, this is not conduct that violates community standards of decency, fairness or reasonableness in the context of this case's particular set of facts. *Cargill Global Trading*, 706 F. Supp. 2d at 580.

Plaintiff asserts that Defendant "negotiating" with him during the period between June 2 and June 18 was in bad faith because he was suffering from a mental health crisis at that time.

Opp. at 10.  Again, the Court notes there is nothing in the record that suggests Defendant had an

illicit motive or was engaging in bad faith while discussing termination with Plaintiff, nor are there

any facts that demonstrate Plaintiff was incompetent or could not handle his own affairs despite

the mental health challenges he was experiencing at the time.  To the contrary, Plaintiff was aware

of his obligations and noted that he wanted to discuss terminating his contract with his lawyer and

asked for a copy of same to review during this time.  SMF ¶¶ 85, 96; *see also* Def.'s Motion for

Summary Judgment at Ex. G.  A party is not required to make only mutually beneficial decisions

in order to act in good faith: "[w]ithout bad motive or intention, discretionary decisions that happen

to result in economic disadvantage to the other party are of no legal significance."  *Citadel*

*Wellwood Urb. Renewal, LLC*, 2023 WL 8184314 at *11.

Therefore, the breach of the covenant of good faith and fair dealing does not apply in this

case and summary judgment must be granted as to this claim as well.

## V.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment, (ECF No.

34), will be **GRANTED**.  An order consistent with this Opinion will be entered.

May    , 2024

KAREN M. WILLIAMS, U.S.D.J.

14